WARNER–LAMBERT COMPANY, Pfizer, Inc., Bayer Corporation, Del Pharmaceuticals, Inc., Del Laboratories, Inc., and Care Technologies, Inc., Appellants,

v.

Katherine MILLS and Veronica Evans, Individually and on Behalf of Others Similarly Situated, Appellees.

No. 09–02–173 CV.

Court of Appeals of Texas, Beaumont.

Submitted June 12, 2003.

Decided Sept. 11, 2003.

Jack Urquhart, Joseph S. Cohen and Robert B. Tobor, Beirne, Maynard & Parsons, LLP, Deborah A. Newman and Kathleen Hopkins Alsina, Phelps Dunbar, LLP, Richard Caldwell, Andrews & Kurth, LLP, Houston, Wayne Peveto, The Peveto Law Firm, Orange, David Klingsberg, Thomas A. Smart and Richard A. De Sevo, Kaye Scholer, LLP, New York, NY, for Appellees.

Clay Dugas, Clay Dugas and Associates, PC, Beaumont, Pat Maloney, Jr., Law Offices of Pat Maloney, PC, San Antonio, Christa Brown, Austin, Troy "Trey" S. Martin III, and Christa Brown, Martin & Cukjati, LLP, San Antonio, for Appellees.

Before McKEITHEN, C.J., BURGESS and DAVID B. GAULTNEY, JJ.

## OPINION

DAVID B. GAULTNEY, Justice.

This is an interlocutory appeal of an order certifying a class action. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(3) (Vernon Supp.2003). Appellants initially complain that the trial court lacked jurisdiction to enter the class certification order because federal law preempts appellees' state law causes of action. Appellants' contend that we have jurisdiction to entertain this issue, and that we must first determine subject matter jurisdiction before we can address any other issue relating to the class certification.

■ Appellate court jurisdiction of the merits of a case extends no further than that of the court from which the appeal is taken. *Pearson v. State,* 159 Tex. 66, 315 S.W.2d 935, 938 (1958). If the trial court lacked jurisdiction, then an appellate court only has jurisdiction to set the judgment or order aside. *Dallas County Appraisal Dist. v. Funds Recovery, Inc.,* 887 S.W.2d 465, 468 (Tex.App.-Dallas 1994, writ denied); *see also Fulton v. Finch,* 162 Tex. 351, 346 S.W.2d 823, 827 (1961). The fact that the instant cause is before us under an otherwise limited right-of-appeal is of no import. As the Texas Supreme Court has observed, § 51.014(a)(3) of the Civil Practice and Remedies Code does not supplant the constitutional requirement that a reviewing court have subject matter jurisdiction.

*See McAllen Med. Center, Inc. v. Cortez,* 66 S.W.3d 227, 231 (Tex.2001).

■ Federal preemption of state law is grounded in the Supremacy Clause of the United States Constitution, which provides that "the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST., art. VI, cl. 2. Where a state law comes into conflict with federal law, the state law is preempted and "without effect." *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576, 595 (1981).

■ Preemption may take one of several forms. A federal law may expressly preempt a state law. *See Great Dane Trailers, Inc. v. Estate of Wells,* 52 S.W.3d 737, 743 (Tex.2001). Federal law may also preempt a state law impliedly, either (1) when the scheme of federal regulation is sufficiently comprehensive to support a reasonable inference that Congress left no room for supplementary state regulation ("field preemption"), or (2) if the state law actually conflicts with federal regulations ("conflict preemption"). *Id.* State law presents an actual conflict when a party cannot comply with both state and federal regulations or when the state law would obstruct Congress' purposes and objectives. *Id.*

■ "The purpose of Congress is the ultimate touchstone" in every preemption case. *See Retail Clerks Int'l Ass'n v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963). Congressional intent may be discerned from the statute's language and structure, as well as other factors. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 486, 116 S.Ct. 2240, 135 L.Ed.2d 700, 716 (1996). The purpose of the statute is revealed through "the reviewing court's

reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.*

■ This case concerns the Food, Drug, and Cosmetic Act, 21 U.S.C.A. §§ 301–397 (1999) (FDCA or Act). The Act's preemption provision provides in part that no state "may establish or continue in effect" any "requirement" that "relates to the regulation" of an over-the-counter drug and that is "different from or in addition to, or that is otherwise not identical with, a requirement" under the FDCA. *See* 21 U.S.C.A. § 379r. A state law action may impose a "requirement" under state law, and therefore be preempted when the state law requirement conflicts with a requirement imposed by federal law. *See Worthy v. Collagen Corp.*, 967 S.W.2d 360, 370 (Tex.1998) (holding state law damage causes of action imposed "requirements" within the meaning of the Medical Devices Act preemption provision). Our preemption analysis looks at whether the state requirement sought to be imposed by this lawsuit is "different from or in addition to, or that is otherwise not identical with" a federal requirement under the Act. *See* 21 U.S.C.A. § 379r.

Our review of the lawsuit and the Act must be conducted within the context of the trial court's certification order, which limited the causes of action appellees were permitted to pursue. Those portions of the certification order are as follows:

The Court finds that the issues that will "occupy most of the efforts of the litigants and the court" are these: (1) Did the Defendants misrepresent their products through their advertising, promotion and marketing practices? (2) Were the Defendants' products fit for the ordinary purposes for which they were to be used? (3) Could the Defendants' products pass without objection in the trade under the contract description? (4) Did the Defendants' products conform to the promises or affirmations of fact made in their advertising and marketing? (5) What was the value of the Defendants' goods as accepted by Plaintiffs at the time and place of acceptance? These are marketing issues, not injury or causation issues. Because the Defendants' marketing practices were substantially the same across the country, the Court finds that the proof on these issues will be common as to all Plaintiffs.

Moreover, subsumed within all of the above issues is the even more fundamental question of whether or not the Defendants' products were formulated to be effective for the cure and treatment of head lice infestations. This is the more precise question on which most of the efforts at trial will focus. Through lay and expert testimony, anecdotal evidence, and documentary evidence, the court is convinced the parties will show whether the products were or were not properly formulated to cure head lice infestations, and whether or not the Defendants knew this when they were advertising and promoting the products.... Most importantly, this question of whether or not the Defendants' products conformed with the affirmations of fact made on their packages, labeling and advertising is a question that is exactly the same for all Plaintiffs in the class.

\*\*\*\*\*\*\*\*\*\*\*\*

Causation regarding the breach of warranty claim can easily be determined as to all class members as a common issue, and will not run afoul of the requirement that causation be determined

as to individuals and not groups. The Plaintiffs will be required to prove that (1) the goods bought and sold were subject to an implied warranty of merchantability, (2) the goods were defective at the time of sale, (3) the defective nature of the goods caused plaintiffs' injuries, and (4) damages were suffered as a result. If the products the Defendants sold are found to be chemically and scientifically ineffective for the cure for Texas head lice infestations, then that will be a producing cause of the plaintiffs' economic loss regardless of what occurred after the consumer purchased the product. Either the product was properly formulated to be an effective cure for Texas head lice infestations at the time it left the Defendants' hands, or it was not. Thus, causation will not require individual proof, but can be determined on a class-wide basis.

\*\*\*\*\*\*\*\*\*\*\*\*

Based on the foregoing, and on the evidence that has been presented to the court in support of certification, the court finds that the following causes of action should be certified in this action: 1) Breach of Implied Warranty under TEX. BUS. & COM.CODE ANN. § 17.50(a)( [2] ); 2) Breach of Implied Warranty of Merchantability under TEX. BUS. & COMM. (sic) CODE ANN. § 2.314.

The Act grants the Food and Drug Administration (FDA), as the designee of the Secretary of Health and Human Services (HHS), the authority to regulate, among other items, "drugs." *See* 21 U.S.C.A. §§ 321(g), 393. In *Kanter v. Warner–Lambert Company,* 99 Cal.App.4th 780, 122 Cal.Rptr.2d 72 (Cal.App.2002, review denied), a case also involving the efficacy of over-the-counter pediculicide [1] products,

the court described in detail the exhaustive process by which the FDA decides whether a drug is ultimately approved for marketing as "safe and effective." The *Kanter* court detailed the pre-market approval process mandated by the FDA as including the following:

A manufacturer seeking approval of a new drug must submit a detailed new drug application in accordance with the requirements of the FDCA and related regulations promulgated by the FDA. (§ 355(b)(1); 21 C.F.R. §§ 314.1–314.3, 314.50 (2001).) Among other information, a new drug application must include "substantial evidence" that the drug is safe and effective, meaning "evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof." (§ 355(d); see 21 C.F.R. § 314.26 (2001) [explaining characteristics of "adequate and well-controlled study"].)

A new drug application must also include "specimens" of the labeling proposed for the drug. (§ 355(b)(1)(F); see 21 C.F.R. §§ 314.50(c)(2)(i) (2001) [application must include proposed text of labeling], 201 et seq. (2001) [general labeling provisions].) If the FDA determines that the labeling of a new drug is false or misleading in any particular, the drug is deemed "misbranded." Whether la-

---

**1.** "Pediculicide drug product. A drug product for the treatment of head, pubic (crab),

and body lice." 21 C.F.R. § 358.603.

beling is false or misleading depends not only on its stated or suggested representations, but also on the extent to which it fails to reveal any material facts. (§§ 352(a), 321(n).) The application will be refused if the FDA determines that the labeling is false or misleading in any particular, if the application contains an untrue statement of a material fact, or if the proposed labeling does not comply with the requirements established in the regulations. (§ 355(d)(7); 21 C.F.R. § 314.125(b)(6), (7), (8) (2001).)

*Kanter*, 122 Cal.Rptr.2d at 76–77.

The FDA may withdraw approval of a drug, after notice and a hearing, "on the basis of new information before [the Secretary of Health and Human Services] with respect to such drug, evaluated together with the evidence available to him when the application was approved, that there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling thereof[.]" *See* 21 U.S.C.A. § 355(e)(3); 21 C.F.R. § 12.1 *et seq.* Subchapter III of the Act contains extensive policing provisions available to the FDA, includes a list of prohibited acts with accompanying civil and criminal penalties applicable to both individual and corporate violators, and provides for injunctive relief. *See* 21 U.S.C.A. §§ 331–337. The Act limits injunctive proceedings to "district courts of the United States and United States courts of the Territories," and provides "all" other proceedings "for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States." *See* 21 U.S.C.A. § 332, 337(a).

FDA regulations specify the active ingredients required to be included in a nonprescription pediculicide drug product in order for the product to be recognized as effective. *See* 21 C.F.F. §§ 330.10 & 358.601, 358.610 (2003). The regulations also specify labeling requirements. 21 C.F.R. § 358.650 (2003). In examining the certification order, and the pleadings at trial and the arguments on appeal, we see no claim that the formula of the products in question ("NIX," "RID," "PRONTO," and "CLEAR LICE"), which was approved by the FDA as "safe and effective" for sale to the general public, was tampered with, changed, re-constituted, or adulterated by appellants. Appellees' lone contention is that the formula, as approved by the FDA, simply does not kill lice. Appellees do not contest the fact that the products in question do indeed comply with the FDA-approved formula for non-prescription pediculicide drug products, and that the products were marketed in compliance with the appropriate approval process mandated by the FDA. *See* 21 C.F.R. § 330.10.

As the trial court detailed in its certification order, the issue in this case is not merely whether appellants' products "work or not," but how the products in question were "formulated." This case does not involve a manufacturing defect, or a claim that some batch of the pediculicides in question did not conform to the FDA regulations; the crux of the claim is that the FDA-specified active ingredients are ineffective. The trial court's certification order would permit "lay and expert testimony, anecdotal evidence, and documentary evidence" as proof that "the products were or were not properly formulated" as an effective treatment for head lice infestation. An additional issue to be litigated would be whether or not appellants knew of any alleged ineffectiveness of their products "when they were advertising and promoting the products." Appellees would attempt to prove that appellants' products were "chemically and scientifically ineffec-

tive for the cure of Texas head-lice infestations." It appears appellees would attempt to prove the FDA regulation—which specifies the active ingredients that must be included if the product is to be considered effective—is simply incorrect, and that appellants' products should not contain the active ingredients specified by the FDA if they are to be marketed in Texas as a treatment for head-lice infestation. In practical effect, the state lawsuit would make unlawful the sale of a product formulated to comply with a federal requirement. This litigation would impose a state requirement that is "different from or in addition to, or that is otherwise not identical with," a requirement under the Act. *See* 21 U.S.C.A. § 379r; *see generally Worthy*, 967 S.W.2d at 370 (state lawsuits may be "requirements" preempted by federal law).

■ We conclude appellees' claims, as certified by the trial court, conflict with the FDA's specific requirements for active ingredients and labeling of pediculicide drug products.[2] What appellees refer to as the "statutory savings clause," 21 U.S.C.A. § 379r(e), which explicitly exempts state "products liability" causes of action from the otherwise preemptive provisions of § 379r, does not aid appellees' position. That Congress included specific exemption language within § 379r suggests Congress' intent to preempt all other statutory or common-law state causes of action. Furthermore, the products liability exception is not available to appellees in the instant litigation, as appellees have expressly disavowed any personal injury or other physical impairment from the use of appellants' products and they are not

claiming the product damaged some other property. TEX. CIV. PRAC. & REM CODE ANN. § 82.001(2) (Vernon 1997), defines "products liability action" as any action against a manufacturer or seller for recovery of damages arising out of "personal injury, death, or property damage" allegedly caused by a defective product. No product liability cause of action has been certified by the trial court in the instant litigation.

We hold that the scope of the causes of action to be litigated, as contained in the trial court's order certifying the class action, are preempted by federal law. The trial court was without subject matter jurisdiction to certify these claims as a class action lawsuit. Appellants' first appellate issue is sustained. The certification order is vacated, and the case is remanded for further proceedings consistent with this opinion.

TRIAL COURT'S CERTIFICATION ORDER VACATED; CAUSE REMANDED.

DON BURGESS, Justice, dissenting.

I respectfully dissent. The majority holds this action is preempted by the FDA regulations; I disagree. The majority states: "In practical effect, the state lawsuit would make unlawful the sale of a product formulated to comply with a federal requirement." The state lawsuit does not seek to prohibit the sale of the product, quite the contrary, it only seeks to afford the plaintiffs a remedy not afforded under the FDA scheme-restitution of the amounts paid for the products. I would

---

2. What is not before us and we are not deciding is any claim or allegation that a particular nonprescription pediculicide does not contain the FDA-approved active ingredients: "the combination of pyrethrum extract (providing a concentration of pyrethrins of 0.17 to 0.33 percent) with piperonyl butoxide (2 to 4 percent) in a nonaerosol dosage formulation." *See* 21 C.F.R. § 358.610.

overrule appellants' first issue and consider the interlocutory appeal on its merits.