**In re Daniel L. and Shawn E. McTYEIRE, Debtors.**

**Daniel L. and Shawn E. McTyeire, Plaintiffs,**

v.

**Charles R. Hunt, Defendant.**

**Bankruptcy No. 03–10605–JDW. Adversary No. 05–1013.**

United States Bankruptcy Court, M.D. Georgia, Albany Division.

May 11, 2006.

---

Walter W. Kelley, Albany, GA, for Plaintiffs.

Charles R. Hunt, pro se, Dawson, GA, for Defendant.

## MEMORANDUM OPINION

JAMES D. WALKER, JR., States Bankruptcy Judge.

This matter comes before the Court on Charles R. Hunt's suit on contract and Daniel and Shawn McTyeire's counterclaim for failure to fully disclose fees and violation of the discharge injunction. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(O). After considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

Debtors Daniel and Shawn McTyeire filed a Chapter 7 petition on March 13, 2003. The Court granted them a discharge on June 27, 2003. Charles Hunt served as their attorney in the bankruptcy case. On August 8, 2003, Mr. Hunt filed a suit on contract against the McTyeires in the Magistrate Court of Lee County, seeking to recover unpaid attorney fees. Mr. Hunt voluntarily dismissed the contract case on November 11, 2003. Mr. Hunt filed a second contract suit against the McTyeires on January 14, 2004, in the same court, which he voluntarily dismissed on July 8, 2005. Mr. Hunt filed a third contract suit against the McTyeires on March 11, 2005. The McTyeires filed a counterclaim seeking actual and punitive damages based on allegations that Mr. Hunt failed to properly disclose his fees and that any unpaid fees had been discharged, and they removed the case to the bankruptcy court.

When the McTyeires began contemplating bankruptcy, they consulted Mr. Hunt. Before they hired him, they watched a video that he shows to prospective clients. The video states several consequences for failing to pay Mr. Hunt's attorney fees, including suing the clients, hunting them down and selling their children into slavery, and dismissing their bankruptcy case.

Nevertheless, the McTyeires hired Mr. Hunt, and they entered into a fee agreement on January 10, 2003. Paragraph 2 of the agreement provided for a fee of $950 plus additional fees and expenses. A list of estimated common additional fees included: "Over 15 creditors, $10 each," and, "Add'l creditors, $50." Paragraph 5 provided as follows: "My retainer fee will be $950.00. This fee is non-refundable. This fee will cover up to 7.6 hours of my time. I estimate that my out-of-pocket expenses will range from $200 to $300." Pursuant to paragraph 4, any time exceeding the 7.6 hours would be charged at a rate of $180 per hour, or $270 per hour for any time spent in court on an adversary proceeding. Paragraph 6, labeled "Special Fee Arrangement/Comments," made the following provisions: "$50 now. $250.00 by Jan 31st. $100.00 bi-weekly beginning Feb. 21st. Will file @ $300.00. $200.00 credit if all fees pd on sched." The McTyeires initialed a paragraph in the agreement labeled "Failure to Pay" that provided, "If I fail to pay on schedule, I understand Mr. Hunt will stop all work; I may lose the case, and I may suffer civil or criminal penalties; plus, the entire balance becomes due immediately." In paragraph 7, the agreement provided that if the McTyeires failed to pay fees "as promised, and if additional work is required to collect the fees and costs, additional atty fees will be

charged in addition to the charges specified above (unless the client makes alternate payment arrangements, before defaulting.)" (Pl.ex.2.)

Mr. Hunt filed a Rule 2016(b) compensation disclosure statement on March 12, 2003, with the bankruptcy petition. In the space to indicate the amount of fees he had agreed to accept, Mr. Hunt struck through $950 and wrote in $1090. In the space to indicate the amount he had received prior to filing of the statement, Mr. Hunt struck through $0.00 and wrote in $300. In the space for balance due, Mr. Hunt struck through $950 and wrote in $790.

Mr. Hunt created a ledger card for the McTyeires on which he kept track of amounts they paid toward his attorney fees and the balance due. The ledger showed the following transactions:

| Date | Service Rendered | Charge | Paid | Balance |
|------|------------------|--------|------|---------|
| 1/10/03 | Ret. | 950.00 | | 950.00 |
| 2/3/03 | # 807 $100 /bi-w Feb 21 | | 100.00 | 850.00 |
| 2/24/03 | Recvd # 2018 | | 100.00 | 750.00 |
| 2/27/03 | extra cred 49–15=34×10 | 340.00 | | 1090.00 |
| 3/11/03 | Recvd # 2035 | | 100.00 | 990.00 |
| 4/21/03 | Recvd # 2050 | | 100.00 | 890.00 |
| 8/6/03 | Prep lawsuit 1 hr @ 180/hr | 180.00 | | 1070.00 |
| 8/6/03 | Int. 7 mos. @ 1.5% × $890.00 | 93.45 | | 1163.45 |
| 8/6/03 | Lawsuit ff B# 5099 Lee Co mag ct. | 79.00 | | 1224.45 |
| 1/10/04 | Lawsuit ff B# 5443 Lee Co mag ct | nc | | 1242.45 |
| 3/10/05 | Credit 8/6/03 filing fees | | 79.00 | 1163.45 |
| 3/10/05 | Filing fee Lee Superior | 85.00 | | 1248.45 |
| 3/10/05 | # 6406 Service fees to Lee Superior | 50.00 | | 1298.45 |
| 3/10/05 | Int from 8/6/03 13 mos. @1.5% × $890 | 173.55 | | 1472.00 |

In addition to the ledger card, Mr. Hunt maintained an escrow card. The escrow card showed the McTyeires made a payment of $50 on January 10, 2003, and a payment of $250 on February 15, 2003. Of that sum, $200 was used to pay filing fees, and the remainder was transferred to the ledger card, where it was listed as the $100 credit on February 3, 2003. Thus, on the date of the bankruptcy filing, Mr. Hunt's records indicated that the McTyeires had paid him $500. Of that amount, he applied $200 toward filing fees and $300 toward attorney fees. The McTyeires paid an additional $100 postpetition.

Mr. Hunt does not keep time sheets or any other contemporaneous record of his time. He testified that keeping a written record of time is unnecessary because he knows how much time it takes to do everything. The McTyeires never received a statement showing the balance due on the attorney fees or an itemization of Mr. Hunt's time. The McTyeires first learned that Mr. Hunt was claiming a balance of over $1,200 when he filed the first contract suit against them. Mrs. McTyeire testified that because she had paid at least $500 and believed she would receive a $200 credit, she thought the balance was minimal. Although she knew the number of creditors in her case exceeded the 15 included in the $950 base fee, Mr. Hunt never told her the total number of creditors or that he had added $340 to his fee to cover the extra creditors. She also said she did not understand that $200 of her payments went to filing fees rather than to attorney fees. Finally, although she knew

the fee agreement required biweekly payments of $100, Mr. Hunt never told her how many such payments were necessary to fully satisfy her obligations.

Mrs. McTyeire testified that she and her husband have each spent approximately 20 hours defending themselves against Mr. Hunt's contract claims. Mrs. McTyeire currently earns approximately $11 per hour, and Mr. McTyeire currently earns approximately $13 per hour. Counsel for the McTyeires submitted a itemization of time spent on the contract suit and the McTyeire's counterclaim, showing hourly fees totaling $19,725 and expenses of $2,151.46.

This Court held a trial on the complaint and counterclaim on March 21, 2006. At the trial, counsel for the McTyeires made a motion for judgment on the pleadings with respect to Mr. Hunt's contract suit. Mr. Hunt raised no opposition, and the Court granted the motion.[1] After hearing evidence and arguments from both parties, the Court took the matter of the McTyeire's counterclaim under advisement, and will enter judgment for the McTyeires for the following reasons.

## Conclusions of Law

### Violation of the Discharge Injunction

■ Section 524 of the Bankruptcy Code establishes the effect of a discharge. It "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [debt discharged under § 727] as a personal liability of the debtor, whether or not discharge of such debt is waived[.]" 11 U.S.C.

§ 524(a)(2). Although the Code does not create a cause of action or remedy for violation of the discharge injunction, the Eleventh Circuit Court of Appeals has held that the Court may impose sanctions using its § 105(a)[2] power for "willful" violations of the discharge injunction. *Hardy v. U.S. (In re Hardy)*, 97 F.3d 1384, 1390 (11th Cir.1996). The circuit court stated that the "language of § 105 encompasses 'any type of order, whether injunctive, compensative or punitive, as long as it is "necessary or appropriate to carry out the provisions of" the Bankruptcy Code.'" *Id.* at 1389 (quoting *Jove Engineering, Inc. v. IRS*, 92 F.3d 1539, 1553–54 (11th Cir. 1996)). The court stated that the test used to determine the willfulness of an automatic stay violation also should be used to measure the willfulness of a discharge injunction violation. *Id.* First, the defendant must have known that the discharge injunction was in effect. Second, the defendant must have intended the actions that violated the discharge injunction. *Id.*

■ In this case, Mr. Hunt has conceded that his attempt to collect prepetition attorney fees by filing a contract suit against the McTyeires violated the discharge injunction. The overwhelming majority of courts, including all circuit courts to consider the issue, have held that such fees are discharged in bankruptcy. *Rittenhouse v. Eisen*, 404 F.3d 395, 397 (6th Cir.2005); *Fickling v. Flower, Medalie & Markowitz (In re Fickling)*, 361 F.3d 172, 176 (2d Cir.2004); *Bethea v. Robert J. Adams & Assoc.*, 352 F.3d 1125, 1127 (7th Cir.2003); *Hessinger & Assoc. v. U.S. Trustee (In re Biggar)*, 110 F.3d 685, 688 (9th Cir.1997) (holding that prepetition

---

1. Pursuant to O.C.G.A. § 9–11–41(a)(3) (Supp.2005), the second voluntary dismissal of a suit "operates as an adjudication on the merits." Mr. Hunt's complaint followed two prior voluntary dismissals and, therefore, could not be sustained.

2. "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

Chapter 7 attorney fees are discharged pursuant to § 727(b), because they are not excepted from discharge under § 523).

■ Were the case law unanimous or if there was binding precedent within jurisdictions, the Court would impose appropriate sanctions, including punitive damages,[3] because Mr. Hunt would have no basis in law to argue or believe that his fees were nondischargeable. However, at least one case that remains good law has held that the prepetition fees incurred by a chapter 7 debtor's attorney are not dischargeable. *In re Perry*, 225 B.R. 497, 500 (Bankr.D.Colo.1998) (by creating a structure for the regulation of attorney fees via § 329 of the Bankruptcy Code and Bankruptcy Rules 2016 and 2017, Congress could not have intended such fees to be eradicated via discharge). Although this Court agrees with the majority view, *Perry* demonstrates that reasonable minds might differ on the dischargeability of prepetition attorney fees. In such circumstances where "willfulness" does not accompany the requisite "knowingness," the Court cannot impose punitive damages. Nevertheless, Mr. Hunt did violate the discharge injunction and the Court may impose sanctions. For that reason, the Court finds the McTyeires are entitled to actual damages including attorney fees incurred in the course of defending the three lawsuits filed against them by Mr. Hunt and in bringing this counterclaim. Counsel for the McTyeires has filed an application for compensation, set for a hearing on May 15, 2006. Mr. Hunt shall be liable for the full amount of attorney fees allowed pursuant to that application.

*Failure to Fully Disclose Fees*

■ Section 329(a) of the Bankruptcy Code provides that a debtor's attorney "shall file with the court a statement of the compensation paid or agreed to be paid" by the debtor. Under Rule 2016(b), the attorney is required to file the statement within 15 days of the order for relief and to file a supplement "within 15 days after any payment or agreement not previously disclosed." These directives are mandatory. *In re Bennett*, 133 B.R. 374, 378 (Bankr.N.D.Tex.1991). Furthermore, they require "direct and comprehensive" disclosures. *In re Saturley*, 131 B.R. 509, 517 (Bankr.D.Me.1991). "Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient." *Id.* Failure to comply with these provisions will subject an attorney to forfeiture of "any right to receive compensation for services rendered on behalf of the debtor," and the disgorgement of any funds already paid by the debtor. *In re Woodward*, 229 B.R. 468, 473 (Bankr.N.D.Okla.1999).

■ In this case, Mr. Hunt filed a fee disclosure statement indicating that he had agreed to accept $1,090 from the McTyeires. This figure includes the $950 retainer, plus $340 for additional creditors, minus a $200 credit. However, that evidences only a partial disclosure of the actual agreement. Pursuant to the fee agreement, the McTyeires would receive a $200 credit if they made all their biweekly payments on schedule. Mr. Hunt should have also disclosed that the fee would be $1,290 if the McTyeires failed to make timely payments. Although the difference between the two fees is nominal, if the Court does not have all the information

---

**3.** In *Hardy,* punitive damages were not available for violation of the discharge injunction because the defendant was the United States. 97 F.3d at 1390. Although Congress waived the government's sovereign immunity, it excluded the imposition of punitive damages from that waiver. *Id.* No such limitation applies to Mr. Hunt.

about the fee, it cannot make an informed decision about whether that fee is reasonable. "Whatever the explanation for disclosure inadequacies, it reflects poorly on counsel[,] and the resulting potential for frustration of the Code's policy of thorough scrutiny is unacceptable." *Saturley*, 131 B.R. at 517. For that reason, the Court finds it appropriate to order disgorgement of all attorney fees paid by the McTyeires to Mr. Hunt, excluding any amounts used to pay filing fees.

### Filing a Frivolous Lawsuit

 The original suit in this case was the contract action filed by Mr. Hunt against the McTyeires. Mr. Hunt conceded that the suit had no basis in law because he had previously dismissed two prior cases. Pursuant to O.C.G.A. § 9–11–41(a)(3), the second dismissal was deemed to be with prejudice. Under such circumstances, the McTyeires could have a state law cause of action against Mr. Hunt for filing the third suit. Under Georgia law, "[a]ny person who takes an active part in the initiation, continuation, or procurement of civil proceedings against another shall be liable for abusive litigation if such person acts: (1) With malice; and (2) Without substantial justification." O.C.G.A. § 51–7–81 (2000). Although the allegations in the McTyeire's counterclaim could state a prima facie case for abusive litigation, such a claim cannot be sustained. Under O.C.G.A. § 51–7–84, the party asserting abusive litigation must give the opposing party written notice of the claim "[a]s a condition precedent" to the claim and an opportunity to withdraw the abusive suit. Assuming the counterclaim set forth allegations sufficient to plead a cause of action for abusive litigation, it seems intuitive

that the counterclaim itself would be sufficient to provide the required notice. However, the Georgia Court of Appeals has held that a counterclaim for abusive litigation cannot be used to give notice of such suit. *Langley v. National Labor Group, Inc.*, 262 Ga.App. 749, 586 S.E.2d 418, 422 (2003).

In this case, the McTyeires made no factual allegations that they provided the necessary notice and offered no evidence of notice. Therefore, Mr. Hunt cannot be liable for abusive litigation under state law.

### Unprofessional Behavior

 In addition to the specific causes of action already addressed, the McTyeires cited various instances of unprofessional behavior by Mr. Hunt. For example, in the video he shows to prospective clients, he makes a variety of threats if they fail to pay his fees. He threatens to hunt them down, to sue them, to sell their children into slavery, and to dismiss their bankruptcy case. In addition, his fee agreement provides that he will stop working if the client fails to pay and the client may lose the case and "suffer civil or *criminal* penalties[.]" (Pl.ex.2) (emphasis added).

 This behavior raises two questions for the Court to consider. First, are Mr. Hunt's various assertions about the consequences of failing to pay attorney fees proper? Assuming the statements in the video were mere hyperbole made to emphasize a point and that Mr. Hunt never intended to take the actions described in the video or in the fee agreement, such statements are still inappropriate and improper. It is not permissible for an attorney to threaten actions that he cannot take—because they are prohibited by law or by ethical considerations—even in jest.[4] The Court disapproves of such conduct

---

4. Although the Rules of Professional Responsibility do not specifically address this issue, Rule 7.1(a) requires any communications

about an attorney's services to be truthful. *See* Ga. R. Prof. Resp. 7.1(a), comment 1. Furthermore, as noted in paragraph 4 of the

and expects attorneys to present a sober and rational demeanor when acting in a professional capacity—either with clients or before this Court.

■ Second, what consequences should flow from Mr. Hunt's behavior? Counsel for the McTyeires argued that Mr. Hunt should be barred from practice before this Court. The Court could consider a recommendation for disciplinary action from the district court, which controls the admission of attorneys to practice before this Court. However, although the Court disapproves of Mr. Hunt's conduct, it does not rise to the level necessary to remove him from practice. A formal reprimand is appropriate in these circumstances. This Court can and does now formally reprimand Mr. Hunt for actions that are unprofessional and beyond the bounds of appropriate conduct. The Court does not expect the conduct to be repeated.[5]

### Conclusion

The Court finds (1) that Mr. Hunt violated the discharge injunction; (2) that Mr.

Hunt failed to disclose the full measure of his fee agreement with the McTyeires; and (3) that Mr. Hunt acted in an unprofessional manner when informing the McTyeires of the consequences of failing to pay his attorney fees. Consequently, the Court shall impose the following sanctions: (1) payment to the McTyeires of actual damages including attorney fees arising from his efforts to collect the discharged attorney fees; (2) disgorgement of all attorney fees paid to Mr. Hunt by the McTyeires, excluding amounts used to pay the McTyeire's bankruptcy filing fee; and (3) formal reprimand by this Court for unprofessional behavior.

An Order in accordance with this Opinion will be entered on this date.

### ORDER

In accordance with the Memorandum Opinion entered on this date, the Court hereby enters JUDGMENT for Daniel and Shawn McTyeire on their counterclaim for

---

Preamble to the Rules of Professional Responsibility, "[a] lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others." *See also Florida Bar v. James*, 530 So.2d 283, 284 (Fla.1988) (finding abusive and intimidating fee collection practices by an attorney to violate the rules of professional conduct).

5. This case is not the first occasion Mr. Hunt has appeared before this Court on a disciplinary matter. If it were, the conclusion of a formal reprimand instead of some more severe disciplinary action would have been an easier one. The previous case involved the failure of Mr. Hunt to remit funds paid to him by clients for filing fees. That previous case is identified as *In re Brown*, No. 00–11954 (Bankr.M.D.Ga. Dec. 7, 2001). In an unpublished decision, the Court concluded that Mr. Hunt would be sanctioned for his conduct. If the allegations of misconduct in this case were related to that previous case, a reprimand in this case would not be appropriate.

While the Court is aware of the previous case and the fact that Mr. Hunt, more than any other lawyer appearing before this Court in the Albany division, seems to be the subject of repeated allegations of misconduct in dealings with clients, these previous incidents were not the subject of proof at the hearing. For that reason, the previous case concerning mishandling of filing fee payments and the previous cases regarding client allegations of unprofessional conduct cannot be appropriately considered in this case in determining an appropriate sanction for the misconduct demonstrated in this case. If, however, there is any recurrence of any of these matters of misconduct, the Court, on its own initiative, will conduct an exhaustive search of the record in these previous cases and compile a complete catalog of prior misconduct. It should be apparent to Mr. Hunt, that a renewed complaint of the kind stated in this case or any of the previous cases is not likely to result in a sanction as lenient as a reprimand.

Charles Hunt's violation of the discharge injunction and failure to fully disclose attorney fees.

The Court further hereby ORDERS Mr. Hunt to pay to the McTyeires $480 in actual damages.

The Court further hereby ORDERS Mr. Hunt to pay Walter Kelley, counsel for the McTyeires, the full amount of attorney fees and expenses awarded to Mr. Kelley at the hearing on his application for compensation set for May 15, 2006, in Albany, Georgia.

The Court further hereby ORDERS Mr. Hunt to disgorge $400 in attorney fees received by him from the McTyeires and to pay that amount to the McTyeires.

The Court further hereby REPRIMANDS Mr. Hunt for unprofessional behavior.

So ORDERED.